Rockhold v. Blevins.

CHAS. ROCKHOLD v. W. D. BLEVINS *et al.*, and BLEVINS and ROCKHOLD, Adm'rs, v. JOHN A. MURPHY.

1. INTERNATIONAL LAW. *Alien enemies. When judgment against void.* A judgment in a suit begun during the civil war in a part of the State under the control of the Confederate authorities, and to which alien enemies of the Confederate States residing in alien territory had been made parties by publication alone is as to them a nullity.

2. SAME. *Same. Loss of funds belonging to. When executor exonerated for.* Trustees are not responsible for loss of funds confided to them not occasioned by their laches or want of good faith. Where, therefore, an executor living in territory subject to Confederate control reported

Rockhold v. Blevins.

and paid over funds held by him as such to a Confederate receiver and under his orders, the legatees of the fund being at the time alien enemies of the Confederacy : *Held*, the legatees could not afterwards recover the amount so paid from the executor.

Case cited: McCaleb v. Peery, 5 Hay, 88.

3. CONFEDERATE NOTES. *Payment in. When executor's liability attaches for receipt of.* Neither would such executor be responsible to said legatees for taking Confederate notes in discharge of a debt to the estate if the payment was received under duress; but if he received them voluntarily without compulsion, and in the absence, and without the consent of the legatees, he would be liable.

4. SAME. *Same. When debtor discharged by.* The liability in such a case would not extend, however, to the debtor who thus discharged his indebtedness. He had the right to pay these notes provided the executor was willing to receive them.

FROM SULLIVAN.

From the Chancery Court at Blountville. H. C. SMITH, Chancellor.

F. M. FULKERSON, NETHERLAND and SHIELDS for complainant.

TAYLOR for Delaney.

DEADERICK for Murphy.

SNEED, J., delivered the opinion of the court.

The original bill in this case is filed by Charles Rockhold, a legatee, under the will of Thomas Rockhold, sr., deceased, against William D. Blevins and Thomas Rockhold, jr., as executors of the will of said Thomas Rockhold, sr., deceased, and J. A. Murphy, the purchaser of the land belonging to said estate. The bill charges that under the last will of the said

Thomas Rockhold, sr., deceased, the said executors were authorized to convert the estate into cash, and after some specific dispositions, to divide the balance equally between the complainant Charles and the defendant Thomas Rockhold, jr. The testator died on the — day of ————————, 1858, and the defendants William D. Blevins and Thomas Rockhold, jr., both qualified as executors under said will, and took upon themselves the discharge of the trusts so imposed upon them. The said Charles and Thomas Rockhold, jr., were both citizens and residents of Kentucky, and were in Kentucky during the period of the late war, and that William D. Blevins, the other executor, had the sole and exclusive management and administration of said estate in Sullivan county, Tennessee, where the estate was and where the testator died. It is alleged that the said co-executor, Thomas Rockhold, jr., after his qualification in Sullivan county, and after assisting in the preliminary steps toward said administration, returned to Kentucky, and knew nothing of its subsequent management. The general purpose of the bill, without specifying its numerous allegations, is to have an account and settlement of said estate and to hold Blevins and his securities and defendant Murphy liable upon an alleged illegal and fraudulent waste of the estate in which it is charged that defendant Murphy participated. It is shown that a large sum of money came into the hands of defendant Blevins belonging to said estate, mainly, the proceeds of the real and personal estate sold by him. An account is taken in the cause which ascertains his indebtedness to be,

after allowing all credits which were sanctioned by the Chancellor, the sum of $6,016.15 to Charles Rockhold and $4,838.93 to the estate of Thomas Rockhold, jr., who has died pending the litigation. The land belonging to the estate was sold by the executors on the 12th of February, 1859, to the defendant Murphy for the sum of $6,795.75, for which he executed his three several notes at one, two, and three years with security, and with a lien upon the land retained under the provisions of the will. It seems that no title bond was executed by the executors to Murphy.

It is charged that the said Blevins had instructions from the complainant then in Kentucky to receive nothing but coin or convertible currency in payment of debts due the estate, but Blevins answers that he has no recollection of this, and it is not proven. It is further charged that there was a combination between Blevins and Murphy to defraud the complainant by the payment and acceptance of Confederate money for said land, which they conspired together to have seized and confiscated soon afterwards by the authorities of the Confederate States. It appears that the defendant Murphy, early in 1863, having paid his purchase money, filed a bill in the Chancery Court at Blountville to have his title vested. To this bill the executors and devisees of Thomas Rockhold, sr., deceased, were made parties. The decree recites that service was had upon Blevins, the resident executor, and publication made as to complainant and Thomas Rockhold, jr., then residents of Kentucky. It also recites the purchase and the payment in full of the

price of the land, and directs the Clerk and Master
to make a deed to the defendant Murphy, which, it
seems, was accordingly done. The bill attacks this
proceeding as fraudulent and void, and charges that
the defendant Murphy procured this decree on the
second day of the return term. That the non-resident
parties had no notice either in law or in fact, and
that the decree was fraudulent and void for the rea-
son that the court was deceived by said Murphy's
representations that the purchase money for said land
was paid, when in fact it had not been except in the
manner already stated, in Confederate treasury notes,
which were worthless and of no value whatever to
complainant, then and still a resident of Kentucky.
The bill seeks to have the decree of the said 19th
of May, 1863, vacated and annulled, and to subject
the land to the payment of the purchase money. The
bill states that the complainant and said Thomas Rock-
hold, jr., being loyal, and citizens of a loyal State,
may have been obnoxious to the confiscation laws of
the Confederate States, but that said laws were void
and of no legal force. That said payment by Blev-
ins to the Confederate authorities under the said con-
fiscation laws was a gross and willful *devastavit*, and
intended by him to aid said illegal government in
overthrowing the lawful authority of the United States
and punishing and impoverishing the enemies of said
Confederate States, and that Murphy and Blevins com-
bined for that purpose. The answer of Blevins de-
nies the allegations of fraud and willful waste, and
claims for him the utmost good faith in the manage-

ment of the estate. He charges that his co-defendant Murphy requested him to report the fund in his hands for confiscation, but this is denied by Murphy, and there is no proof. He states that when he was summoned to report to the receiver under the confiscation laws he at once wrote to his co-executor of the fact, and admonished him to come to Tennessee and look after his interest, which he did not do.

He makes the following explanation in regard to that transaction : " Respondent was summoned by the Confederate authorities and required to report what was in his hands belonging to persons residing beyond the limits of the Confederate States, and he was required to report the amount due from said Murphy to said estate, and to collect the same in Confederate money, to be paid over to M. T. Haynes, the receiver of the Confederate States in this portion of Tennessee. Respondent thus received of said Murphy in Confederate money about the sum of $5,664.74, which was paid over to said receiver. This was done contrary to the wishes of respondent, and it was forced upon him by military power that he could not control." He insists that he should not be held to account for any of said Confederate money transactions with Murphy or otherwise, as the same were against his wishes, and the result of military pressure and compulsion which was then the paramount law. The answer of Murphy denies all the allegations of the bill which impute fraud or bad faith to him in the transactions. He asserts that he has bought and paid for the land in good faith; that his first note was

paid in gold and convertible bank notes, and that the other two were paid mainly in State bank funds, and that less than $2,000 of the amount was paid in Confederate money. He denies that he ever reported, or asked his co-defendant to report, the fund for confiscation. He states that the receiver was a citizen of the county and knew perfectly the *status* and ownership of the fund, and had formerly had some of the business of the estate under his control as an attorney. He asserts the regularity and good faith of the proceeding in which the title to the land was decreed to him, and states that his co-defendant Blevins encouraged him to pursue that course, and promised to make no contest about it.

In the progress of the cause Blevins and Thomas Rockhold, jr., as executors, file their bill against Murphy in which they reiterate the charge of the original bill as to the payments in Confederate money as to the fraudulent procurement of said title in the Chancery Court, and they again charge that Murphy reported said fund for confiscation, or procured the same to be done, in order that he might get the benefit of a payment in Confederate money then abundant and easily obtained.

The two causes were consolidated and heard together. In this last mentioned bill occurs this passage in regard to said confiscation proceeding: "The country was then under strict Confederate military rule, and complainant Blevins was constrained, under said order and against his will and desire, to collect the remainder due from the defendant in Confederate

money and pay over the same to said receiver for confiscation." The bill seeks also to set aside the decree of title and to subject the land to the payment of the amount so sought to be discharged by Murphy in Confederate money. The answer of Murphy embodies in substance his answer to the original bill as hereinbefore stated.

The decree of the Chancellor holds Blevins and his securities liable for the whole amount ascertained by the account to be due, and holds the payment to the receiver to be unauthorized and illegal. The decree also vacates the decree of the 19th of May, 1863, by which the title was vested in Murphy, and subjects the land to the payment of Blevins' debt to the amount of the Confederate money so paid by Murphy upon his purchase. The defendants Blevins and Murphy have appealed.

Upon a careful consideration of the proof in the cause we can see no good reasons to believe that in any of these transactions the defendant Blevins, or, indeed, the defendant Murphy, were actuated by a purpose to wrong and defraud the legatees of Thomas Rockhold. Under all the circumstances of this case there could be no conceivable motive for either of them to do so. The one was executor and the trusted friend of the complainant's uncle; the other a mere purchaser of the land, whose honesty of purpose is evinced by his prompt payment of his first note in 1861 in gold and convertible bank notes; by the payment of the second with reasonable promptness; and by the payment of the third in like manner in

Rockhold v. Blevins.

the currency of the country and such as he was compelled to receive and obliged by the necessities of the times to pay out.   If it be true, as charged, that Murphy suggested the propriety of reporting the Rockhold estate for confiscation, it does not appear that it was so reported by Blevins, and it is certain there was nothing for Murphy to gain by that proceeding. It is insisted that there was some measure of advantage in the payment of Confederate money, which, in 1862, was the currency of the country; but then it appears that coin had disappeared from circulation—the suspension of the banks in Tennessee had been sanctioned, if not invoked, by statute, and Confederate treasury notes were of a value almost equal to State bank paper, according to the proof at the time the last note fell due.   No man dared at that time to discredit the currency of the army at the peril of his liberty.   Its acceptance was enforced, we are told, at the point of the bayonet.   The taxes of the State were required to be paid in it, and the banks of the State required to receive it.   We are told that in Sullivan county even the courts of justice were overawed, and judicial sales were satisfied in this all-pervading currency.   If it be true, then, that the defendant Murphy did connive at the confiscation of this fund, which he utterly denies, it is certain that there was no prospect of impending personal advantage to him.   We must, therefore, look elsewhere for the motive, than in a purpose to benefit himself at the expense of the complainant.   Those of us who have had occasion to observe in the courts of justice the

utter decay and treachery of human memory as to events which occurred during the distractions of the late civil war, are not apt to expect the utmost accuracy in narrations of the events of that unhappy time. The defendant Blevins has asserted twice in pleading that Murphy proposed the confiscation of the complainant's estate. But Murphy denies it, and there is no proof; and even in the deposition of Blevins, twice or thrice taken, no reference is made to the charge, where it must rest, and we are left to assume that the defendant Blevins had become satisfied of his error in this respect before his depositions were taken. In the absence of any fraud in fact, then, on the part of either of these defendants, their rights and equities, and those of the adverse parties, must be referred to certain well established doctrines of the laws of war, as well as to certain familiar rules of a court of equity, which, while it abhors a fraud, will look with indulgence upon a wrong done under necessity or with good intention. We understand it to be established that at the time these payments were made upon Murphy's purchase, the complainants Charles Rockhold and Thomas Rockhold, jr., the only parties interested in the fund, were citizens of Kentucky. We judicially know that after the beginning of hostilities in the late war that State was in the anomalous condition of being claimed by both parties to the conflict, so that under the laws of war it must be regarded as alien territory as to these complainants, the avowed enemies of the Confederate States, and they must be regarded as alien enemies, having no right of com-

mercial intercourse with the defendants, and against whom the courts of this State were closed. And this follows as a consequence of war and from the very nature of war itself with or without a public interdiction from the goverment: Wheat. Inter. Law, sec. 307. The defendant Blevins was only a trustee of the fund without an interest. At the time of the sale it seems that no title bond was given by the executors, or either of them, to Murphy. His only remedy upon the payment of the purchase money was to appeal to the courts for a title, and in thus appealing the complainants Charles and Thomas were necessary parties and must be before the court. A publication as to them in 1863, or at any time during the war, was a nullity, and did not have the effect to bring them before the court. Under the laws of war they dared not come within the military lines of the Confederate States to litigate their rights in court; and it would be a mockery of justice to hold that a mere publication would make them parties to a litigation here and bring them before the court. In the case of *Conn. Life Ins. Co.* v. *Winchester Hall,* it was held that during the recent war contracts between citizens of the opposing belligerents were completely suspended, and cannot be enforced even by a proceeding *in rem.* And that, therefore, a mortgagee of land in Illinois could not sue out his mortgage while the mortgagor was a citizen of Louisiana, which was in insurrection; and a decree of foreclosure made under such circumstances was opened by a court of equity, although the statutory period for redemption had passed:

7 Am. Law Reg., 606. This is the doctrine of the courts of Illinois, and it must be recognized everywhere as based upon the soundest principles of morality, justice, and law. The court in discussing that question, said: "If the mere publication of a notice in the newspaper be made the ground of jurisdiction against an enemy's property in such a case, why might it not also against an infant *in utero*, or against the property of a dead man? Titles thus acquired would rest upon a basis of robbery, not upon a judicial divestiture recognized as just *jure gentium*." Id., 617. For this and other irregularties attending the proceeding of the 19th of May, in the Chancery Court at Blountville, it cannot be pretended that the legal title to the land has ever been lawfully vested in the defendant Murphy, and his right to such investiture depends on the question whether he has paid for the land. This being so, it is clear that if any of the purchase money remains unpaid a lien still exists upon the land. And the proceeding referred to being null and void as to all parties, that lien may be enforced either under the bill of the complainant in the original bill or under that of the execution. It results, however, that any relief under this branch of the case must be given under the latter, as the complainant in the original bill has not appealed.

We proceed to inquire, then, whether the defendants Blevins and Murphy are in any view liable to the complainant or to the legatees under the will. There is no proof in the record that either of these defendants connived at the seizure of the fund under

Rockhold v. Blevins.

the confiscation laws; if that were so the whole case, perhaps, would be relieved of its difficulties. If there be then any liability on account of this payment of the fund to the receiver, it must fall upon Blevins and his sureties alone, as it is clear that no complicity in that transaction is thrown by the proof upon the defendant Murphy. His liability as purchaser, if any, must rest upon other and distinct grounds, which we will consider hereafter.

There can be no doubt, under the proof, that Mathew T. Haynes was the receiver, in behalf of the Confederate States, of the property and effects of alien enemies under the authority of law: Act of Conf. Congress, August, 1861. There can be no doubt that the region of country where the defendants lived was at the time of these transactions under absolute military control, and that said receiver had the power to enforce his orders and demands upon the people, and that he was in the habit of doing so under threats of arrest. There can be no doubt, either, that the Confederate States at that time was in the habit of enforcing all its laws and treasury regulations at the point of the bayonet, and that any citizen who disobeyed or defied that brief, but gigantic authority, did so at the peril of his personal safety. Whether it was a government of paramount force or a government *de facto*, lawful or unlawful, it was nevertheless a government with defined jurisdiction and powers, and with a military force at its back to compel obedience to its mandates and to make its laws effectual. Under the laws of war and under all the traditions of civili-

zation, the ·citizen who lived within its borders owed his allegiance to this government, and was bound to obey its laws.   The defendant Blevins was the trustee of a fund belonging to the confessed enemies of this government.   He was thus made trustee because the testator had faith in his integrity and fidelity, and this confidence he seems to have transmitted to his kindred since they have continued to entrust this estate to the sole and exclusive control of the defendant, notwithstanding the impending perils of a great civil war, which finally ostracised them as alien enemies.   Thus situated, he was required, by order which he dared not disobey, to deliver this trust fund to the authorities of the government to which he owed his allegiance, and which, under the laws of war, had the undoubted power to seize it.   A trustee is not required to do that which is impossible, and under the circumstances we would hold it to be an assumption of judicial power, monstrous and unprecedented, to hold a trustee liable.   It is a doctrine of a court of equity, often reiterated in this court, that a trustee will not be held responsible for the loss of a trust fund if the loss be not occasioned by his own *laches* or bad faith: *Elliott* v. *Carter*, 9 Gratt., 559; *Taylor* v. *Benham*, 5 How., 233; *Knight* v. *Lord Bymoth*, 4 A. and K., 486; 1 Dickins R., 126; *Thompson* v. *Brown*, 4 Johns. Ch. R., 619; *Hart* v. *Ten Eyck*, 2 Johns. Ch. R., 62; *Wickerson* v. *Stafford*, 1 Ves., Jr., 32; *Veg* v. *Emery*, 5 Ver., 141; *McCaleb* v. *Peery*, 5 Hay. R., 88.

We are of opinion that the defendants are not lia-

ble for this fund or any part thereof, upon the grounds alone that it was thus seized and confiscated by the authority of the Confederate States.

It remains to be considered whether the defendants can be held liable for the amount of said purchase money shown to have been paid by Murphy to Blevins in Confederate money. It is alleged by defendant Blevins that he was required by the receiver to collect the balance of the purchase money in Confederate notes, but no proof is offered in corroboration of this statement, and the summons of the receiver having no date, we are not advised as to the time of its issuance or service; or whether at that time the whole purchase money was or was not paid to the defendant Blevins. We are therefore left to treat the transaction as a voluntary paying and receiving, without duress or compulsion upon either party. If it be true, however, that the defendant Blevins acted under the orders of the receiver in collecting any part of the fund in Confederate money, then upon the principles already discussed, the defendants would not be in any event liable for the part thereof so collected. But in view of the peculiar relations of the parties, Blevins and the beneficiaries, and the extraordinary circumstances surrounding them, the defendant Blevins should be held liable for all collections in Confederate money not so made under compulsion. For as far as the complainants are concerned—alien enemies, and living outside of the military lines of the Confederate States—such a payment was as to them no payment at all. And the defendant Blevins must be held to have

Rockhold v. Blevins.

known the Confederate treasury notes could be of no value to the beneficiaries of the trust fund. But as Blevins held Murphy's notes for the land, and had a right to collect them, payments thereon to Blevins by Murphy, although in Confederate money, were valid, and as against Murphy cannot now be inquired into or disturbed. It was not incumbent on him to see to the application of the funds by Blevins, and there is nothing to implicate Murphy in any fraudulent arrangement with Blevins by which the beneficiaries were sought to be injured. He only exercised his right to discharge and take up his notes, and as Confederate money was the currency of the country, and as Blevins, who held the notes, was willing to receive payment in that currency, he cannot be held responsible. As the proof does not satisfactorily disclose what proportion of the money collected by Blevins was made under the orders of the receiver, which we hold to be compulsory, and what amount was not so made, the cause will be remanded that these amounts may be ascertained upon proper reports. Blevins and his securities will be held responsible for the amount ascertained to have been collected by him, not under military compulsion, but as to the amount, if any, so collected under compulsion, he and his sureties will not be held responsible. The account will be opened to ascertain the amount so due, and the complainants will be entitled to a decree against Blevins and sureties for all so ascertained to be due, and all balance due the beneficiaries upon any account properly involved in this litigation. The account will ascertain, also, if

Craighead v. Kincaid.

any balance of purchase money be still due from Murphy, and if so, a lien is declared on the land for its payment, and a decree will be entered accordingly; and if it should appear that under the principles of this opinion Murphy has paid all he contracted to pay, he will be entitled to have his right and title in said land decreed to him.

The costs will be paid by Blevins.